**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| MILLER CONSTRUCTION COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, *et al.*<br><br>Defendants. | Case No. 1:24-cv-00007-SLG |
| ZURICH AMERICAN INSURANCE COMPANY, *et al.*,<br><br>Counterclaimant/<br>Third Party Plaintiffs,<br><br>v.<br><br>MILLER CONSTRUCTION COMPANY, *et al.*,<br><br>Counterclaim/<br>Third Party Defendants. | |

**ORDER ON DEFENDANTS ZURICH AMERICAN INSURANCE COMPANY AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND'S MOTION FOR SUMMARY JUDGMENT**

Before the Court at 78 is Defendants and Third-Party Plaintiffs Zurich American Insurance Company and Fidelity and Deposit Company of Maryland's (collectively, the "Sureties") Motion for Summary Judgment.[1] Plaintiffs Miller

[1] *See also* Docket 79.

Construction Company, Ltd. ("MCC") and Kemp Engineering, LLC ("KE"), and Third-Party Defendants MCC, Pacific Coast Paving, Inc., Timothy A. Miller, and Terrence J. Miller (collectively, the "Indemnitors"), responded in opposition at Docket 87.[2] The Sureties filed a reply at Docket 91. Oral argument was heard on June 24, 2026.[3]

## BACKGROUND

The facts, viewed in the light most favorable to Indemnitors for purposes of this motion for summary judgment, are as follows:

MCC is an Alaska limited liability company and construction company based in Juneau, Alaska.[4] This matter arose from a dispute between MCC and the Alaska Department of Transportation and Public Facilities ("DOT&PF"). In May 2016, MCC and DOT&PF entered into a contract related to a highway construction project known as "KTN: Ketchikan Road to Shelter Cove; Stage 2" (the "Shelter Cove Project").[5] Under the contract, MCC was to construct a one-lane gravel road with turnouts that would connect the Ketchikan road network to the Shelter Cove road network.[6] As required by the contract between MCC and DOT&PF, on May 4, 2016, MCC obtained payment and performance bonds from the Sureties,

---

[2] *See also* Docket 88.

[3] Docket 96.

[4] Docket 1-1 at ¶ 1.

[5] Docket 1-1 at ¶ 8.

[6] Docket 1-1 at ¶ 8.

naming MCC as principal and the State of Alaska as obligee.[7] In early 2017, the Sureties and Indemnitors also entered into a General Indemnity Agreement ("GIA").[8] In relevant part, the GIA provides that

> **2. INDEMNITY:** Indemnitors shall exonerate, indemnify, and hold Surety harmless from any and all liability and Loss, sustained or incurred, arising from or related to: (a) any Bond, (b) any Claim, (c) any Indemnitor failing to timely and completely perform or comply with this Agreement, (d) Surety enforcing this Agreement or (e) any act of Surety to protect or procure any of Surety's rights, protect or preserve any of Surety's interests, or to avoid, or lessen Surety's liability or alleged liability. The liability of Indemnitors to Surety under this Agreement includes all Claims made on Surety, all payments made, Loss incurred, and all actions taken by Surety under the Good Faith belief that Surety is, would be or was liable for the amounts paid or the actions taken, or that it was necessary or expedient to make such payments or take such actions, whether or not such liability, necessity or expediency existed. Indemnitors shall promptly, upon demand, make payment to Surety as soon as liability or Loss exists, whether or not Surety has made any payment. An itemized statement of Loss, sworn to by any officer of Surety, or the voucher or other evidence of any payment shall be *prima facie* evidence of the fact, amount and extent of the liability of Indemnitors for such Loss.[9]

The GIA defines "Loss" as

> all premiums due to Surety and any and all liability, loss, Claims, damages, court costs and expenses, attorneys' fees (including those of Surety), consultant fees, and all other costs and expenses, including but not limited to any additional or extra-contractual damages arising from the Surety's Settlement of any Claim. Pre-judgment and post-judgment interest shall accrue from the date of any

---

[7] Docket 1-1 at ¶ 9; Docket 79 at ¶ 3 (Domres Decl.); Docket 79-1 at 2-5. The GIA was dated January 18, 2017, but was not executed by all Indemnitors until March 2017. Docket 79-1 at 9, 18.

[8] Docket 79 at ¶ 4 (Domres Decl.); Docket 79-1 at 9-19.

[9] Docket 79-1 at 9.

> payment made by Surety with respect to any of the foregoing at the maximum default rate permitted by law.[10]

Further, the GIA provides that "[t]his Agreement shall only be changed or modified in writing" and that "this Agreement shall be governed by and interpreted under the laws of the State of New York, without regard to principles of conflicts of laws."[11]

In 2017, after construction began, disputes arose between MCC and DOT&PF related to the Shelter Cove Project. Ultimately, on December 30, 2017, DOT&PF terminated the construction contract with MCC for default.[12] In response to its termination, MCC filed claims against DOT&PF, including a claim that the termination for default was wrongful and should instead have been a termination for convenience, which DOT&PF denied.[13]

In March 2018, Indemnitors, an engineer, and MCC's attorney met with Marc Domres—the Sureties' representative—"for the purpose of persuading [the Sureties] that MCC should not have been terminated for default and that [the Sureties] should not participate in funding the completion of the Shelter Cove Project."[14] Mr. Domres was told that MCC had constructed seven miles of the road

[10] Docket 79-1 at 13.

[11] Docket 79-1 at 12.

[12] Docket 1-1 at ¶ 17.

[13] Docket 1-1 at ¶¶ 18-19.

[14] Docket 1-1 at ¶ 22.

and that at the time of termination the project was 90% complete.[15] After the meeting, the Sureties issued a request for proposals to solicit bids for completion of the Shelter Cove Project and subsequently engaged another contractor to finish the Shelter Cove Project.[16] DOT&PF and the Sureties then entered into an agreement in which the Sureties were relieved of the obligation to build the road in exchange for a payment to DOT&PF of $3.75 million.[17]

During MCC's challenge to DOT&PF's termination of the contract, the Sureties and Indemnitors entered into a Trust Account and Settlement Authority Agreement.[18] Pursuant to the Agreement, the Sureties funded a trust account with $200,000 to pay MCC's attorneys for work on MCC's claims against DOT&PF.[19] MCC was ultimately successful in its challenge to DOT&PF's termination; an administrative law judge issued a decision finding that "DOT&PF's termination of MCC was wrongful"; "DOT&PF was liable for breach of contract"; "the termination was converted to a termination for convenience"; DOT&PF owed damages to MCC

---

[15] Docket 1-1 at ¶ 22.

[16] Docket 1-1 at ¶¶ 23-24.

[17] Docket 1-1 at ¶ 25; *see* Docket 79-1 at 23 (showing July 24, 2018 payment to State of Alaska for $3,750,000).

[18] Docket 79-1 at 27-38.

[19] Docket 58-2 at 16-17; *see* Docket 79-1 at 23 (showing November 24, 2021 payment to MCC's retained law firm for $200,000).

for termination for convenience; and the amount of damages would be determined in the next phase of the administrative proceeding.[20]

On April 6, 2022, before the damages phase began, DOT&PF served on MCC an offer of judgment for $7.5 million (the "Offer").[21] On April 18, 2022, Garth Schlemlein, MCC's attorney, accepted the Offer.[22] That same day, Mr. Domres sent an email to Mr. Schlemlein asking him to forward "the acceptance of the State's Offer of Judgment by Miller Construction. To the extent, no acceptance is made by Miller, as authorized by the Settlement Authority Agreement and the General Agreement of Indemnity executed by indemnitors, Surety directs acceptance of the Offer of Judgment . . . ."[23] Mr. Schlemlein replied, attaching the Acceptance of the Offer of Judgment to the reply email and stating that "based on Zurich's agreement to forgive $1 million of the sums due [to] Zurich, MCC has authorized me to forward the attached Acceptance of the Offer of Judgment."[24]

Thereafter, DOT&PF wired the $7.5 million settlement, less $1,195,658.59 in obligations MCC owed to the Internal Revenue Service, to MCC's bank

---

[20] Docket 1-1 at ¶¶ 26, 33.

[21] Docket 1-1 at ¶¶ 34-35; Docket 58 at 6.

[22] Docket 57 at 11-12 (citing Docket 38-1).

[23] Docket 58-2 at 31.

[24] Docket 58-2 at 31. The date of Mr. Schlemlein's response is not shown on the email and the email purports to copy Timothy Miller and Terry Miller. Timothy Miller denies receiving the email. Docket 63-1 at 20, ¶ 10(g) (Miller Decl.).

account.[25] Indemnitors and DOT&PF signed a Settlement Agreement dated July 28, 2022.[26] The Settlement Agreement provided in relevant part that "Miller Construction's surety, the Fidelity and Deposit Company of Maryland ("FDCM"), has advised that it is unwilling to waive or release any potential claims it has against the Parties to this Agreement."[27] Settlement funds were used to pay a bank loan owed by MCC, MCC's attorneys, and the Sureties, with the Sureties receiving $4,474,114.88.[28] Although certain of the Indemnitors' debts were paid off by the settlement, Indemnitors did not directly receive any of the settlement proceeds.[29]

On August 23, 2022, Mr. Schlemlein sent an email to Pat Kemp, a principal at KE, in which he explained that because some of the settlement funds had been used to pay off MCC's bank loan, "the remaining funds were not sufficient to pay Zurich and our firm. As a result, Zurich, in addition to writing off $1,000,000 in principal and waiving its interest claim (consistent with its agreement the Millers) accepted $51,357.00 less than the agreed amount."[30] On November 22, 2022,

---

[25] Docket 1-1 at ¶¶ 40-41; Docket 79-1 at 42.

[26] Docket 79-1 at 40-50.

[27] Docket 79-1 at 43. FDCM is a subsidiary of Zurich. Docket 4 at 1 (stating that FDCM is a wholly owned subsidiary of Zurich American Insurance Company).

[28] Docket 1-1 at ¶¶ 43-44; Docket 79 at ¶ 11 (Domres Decl.).

[29] Docket 1-1 at ¶ 46.

[30] Docket 63-2 at 19-20.

Mr. Kemp forwarded the email messages between him and Mr. Schlemlein to Mr. Domres.[31] On November 23, 2022, Mr. Domres responded to Mr. Kemp, stating that "Garth's summary below is accurate as to how the settlement was disbursed and as to the in excess of $1 million loss surety took on this matter."[32]

In April 2024, MCC and KE sued the Sureties alleging that the Sureties violated the covenant of good faith and fair dealing and acted negligently by accepting the Offer even though they knew or should have known that MCC was entitled to substantially more damages from DOT&PF, and were unjustly enriched by receiving services from KE without payment.[33]

In June 2024, the Sureties filed counterclaims against MCC and third-party complaints against other Indemnitors, alleging that Indemnitors breached the GIA by failing to fully satisfy their obligation to indemnify the Sureties for losses incurred under the GIA.[34] In their Answers to the Sureties' claims for breach of contract, Indemnitors raised various affirmative defenses, including that the Sureties' claims are barred by the doctrines of estoppel, waiver, and laches, and "because [the Sureties] failed to act in good faith in settling MCC's claim and in defending, settling, and resolving the Bonds [the Sureties] issued on behalf of MCC."[35]

---

[31] Docket 63-2 at 18-20.

[32] Docket 63-2 at 17-18.

[33] Docket 1-1 at ¶¶ 51-58, 72-76.

[34] Docket 18 at 20, 26-28, ¶¶ 3-7, 38-57.

[35] *See, e.g.*, Docket 28 at 6, ¶¶ 3-6.

In an order issued on April 16, 2025, this Court found that MCC's attorney had accepted the Offer, not the Sureties; granted the Sureties' Motion for Judgment on the Pleadings; and dismissed Plaintiffs' claims against the Sureties with prejudice.[36] The only claims that remain as between the Sureties and Indemnitors are the Sureties' claims against Indemnitors for breach of the GIA. It is on those claims that the Sureties now seek summary judgment and the entry of judgment against Indemnitors for "(1) $1,063,749.67 in unreimbursed bond-related Loss arising from the Shelter Cove Project; and (2) $102,925.46 in Loss incurred after August 15, 2022, and through the date of this motion, arising from this lawsuit and the Sureties' enforcement of the GIA."[37]

**JURISDICTION**

The Sureties and Indemnitors are citizens of different states and the amount in controversy exceeds $75,000.[38] Therefore, the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Under diversity jurisdiction, the Court generally applies federal procedural law and Alaska substantive law.[39]

---

[36] Docket 57 at 9-15.

[37] Docket 78 at 28.

[38] *See* Docket 1 (stating that Plaintiffs are citizens of Alaska and Michigan and Defendants are citizens of New York, Illinois, and Washington, and Defendant Zurich Insurance Group Ltd is a foreign corporation).

[39] *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the burden of showing that "there is an absence of evidence to support the nonmoving party's case."[40] If the movant meets this burden, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'"[41] The non-moving party may not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."[42]

When evaluating the record on a motion for summary judgment, a court must "view the facts and draw reasonable inferences" in the light most favorable to the non-moving party.[43] Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"[44]

---

[40] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[41] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e) (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[42] *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

[43] *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted).

[44] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz.*, 391 U.S. at 289).

## DISCUSSION

The Sureties maintain that they are entitled to summary judgment because the GIA is enforceable as a matter of law and the Sureties have proffered prima facie evidence establishing the amount of loss for which Indemnitors are responsible pursuant to the terms of the GIA.[45] While Indemnitors do not challenge the validity and enforceability of the GIA as a general matter, they maintain that summary judgment to the Sureties is not proper because there are genuine issues of material fact as to whether the GIA was modified or the Sureties waived their right to additional indemnification from the Indemnitors.[46] Specifically, Indemnitors contend that the Sureties "agreed to forgive $1 million of the sums due[.]"[47] To support this assertion, Indemnitors point to the April 2022 email in which Mr. Schlemlein wrote that "based upon Zurich's agreement to forgive $1 million of the sums due [to] Zurich, MCC has authorized me to forward the attached Acceptance of the Offer of Judgment"[48]; a recorded conversation between Timothy Miller and

[45] Docket 78 at 19-23.

[46] Docket 87 at 10-16.

[47] Docket 87 at 10.

[48] Docket 87 at 10 (citing Docket 58-2 at 31).

Mr. Domres[49]; and the August and November 2022 emails between Mr. Schlemlein, Mr. Domres, and Mr. Kemp.[50]

The Court finds that the August and November 2022 emails demonstrate that a dispute of material fact exists as to whether the Sureties agreed to forgo recovery under the GIA for $1 million in losses arising from the bonds issued to Indemnitors. Viewing the emails in the light most favorable to Indemnitors, the November 2022 email from Mr. Domres, stating that "Garth's summary below is accurate as to how the settlement was disbursed and as to the in excess of $1 million loss surety took on this matter,"[51] affirms Mr. Schlemlein's statement to Mr. Kemp that "[the Sureties], in addition to writing off $1,000,000 in principal and waiving its interest claim (consistent with its agreement the Millers), accepted $51,357.00 less than the agreed amount."[52]

The Sureties seek to avoid this conclusion by arguing that "[t]he undisputed record does not support" Indemnitors' claim that the Sureties agreed to waive $1 million in indemnity because there is "no executed agreement reflecting any such

---

[49] Docket 87 at 11. The Sureties object to the Court's consideration of the recorded conversation on the grounds that at the time of the recording, Mr. Domres was residing in California, which is a two-party consent state, and therefore the conversation was unlawfully recorded. Docket 91 at 10 n.2. Because Indemnitors rely on other evidence that the Court finds creates a dispute of material fact, the Court does not consider the recording of the conversation in resolving the Sureties' motion. The admissibility of the recording at trial can be determined in a motion in limine, as to which the Court expresses no opinion at this time.

[50] Docket 87 at 11-12 (citing Docket 63-2 at 18-20).

[51] Docket 63-2 at 17-18.

[52] Docket 63-2 at 19-20.

waiver."[53] The Sureties emphasize that the Settlement Agreement dated July 28, 2022 between the Indemnitors and DOT&PF "expressly confirms that the Sureties did not agree to waive their claims."[54] However, the Settlement Agreement was executed before the August and November email exchange between Mr. Schlemlein, Mr. Domres, and Mr. Kemp and it therefore does not foreclose the possibility that irrespective of the terms of the Settlement Agreement, at some point the Sureties agreed to waive indemnity for $1 million of their losses.

The Sureties also contend that "[t]he absence of any written agreement where one was anticipated—and required—defeats mere allegations that the GIA was modified."[55] But as the Sureties recognize, under Alaska law, "written contracts may be modified by subsequent oral agreement or conduct, [and] the party asserting modification bears the burden of demonstrating objective mutual assent to the modified terms."[56] The Sureties maintain that the record contains no evidence of a modification.[57] However, as found above, there is a dispute of

---

[53] Docket 91 at 9-10.

[54] Docket 91 at 10; *see also* Docket 79-1 at 43 providing that "Miller Construction's surety, the Fidelity and Deposit Company of Maryland ("FDCM"), has advised that it is unwilling to waive or release any potential claims it has against the Parties to this Agreement.").

[55] Docket 91 at 11.

[56] Docket 78 at 23 (first citing *Alaska Statebank v. Fairco*, 674 P.2d 288, 292 (Alaska 1983); and then citing *Nat'l Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 586 (Alaska 1976) (requiring evidentiary facts supporting modification and cautioning that modification cannot be inferred from conduct alone)). The Court notes that the GIA provides that the law of the State of New York governs the agreement. However, the parties invoke Alaska law in their briefing.

[57] Docket 78 at 23.

material fact as to whether there was a modification of the GIA by a potential waiver by the Sureties of $1 million in their asserted losses.

Further, raised for the first time in their reply brief, the Sureties maintain that the modification to forgo $1 million in indemnity fails as a matter of law for lack of consideration.[58] But a reply brief should not raise new arguments; rather, its purpose is "restricted to rebuttal of factual and legal arguments raised in the opposition."[59] A "court need not consider arguments raised for the first time in a reply brief."[60] Therefore, the Court declines to consider the Sureties' argument in their reply that the purported modification fails for a lack of consideration.

Indemnitors also contend that summary judgment is inappropriate because there are genuine issues of material fact as to Indemnitors' affirmative defenses alleging that the Sureties violated the implied covenant of good faith and fair dealing and failed to reasonably investigate MCC's claims against DOT&PF.[61] The Sureties respond that this Court has already dismissed these claims against the Sureties with prejudice.[62]

In a prior order, this Court found that "Plaintiffs' claim for breach of the implied covenant of good faith and its negligence claim both fail because the

---

[58] Docket 91 at 12.

[59] D. Alaska L.R. 7.1(c).

[60] *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

[61] Docket 87 at 16-21.

[62] Docket 91 at 5 & n.1

Sureties did not accept the Offer of Judgment. The acceptance of the Offer of Judgment was signed by an attorney at SF&F, who was counsel for MCC, not the Sureties," and therefore "the breach of the covenant of good faith and negligence claims—which seek to impose liability on the Sureties for accepting the Offer of Judgment when MCC is alleging its claims were worth far more—are fatally flawed."[63]

This Court's prior order was limited to dismissing Plaintiffs' claims against the Sureties based on the allegation that the Sureties had improperly accepted the Offer. The Court dismissed those claims because the record clearly demonstrates that it was MCC, and not the Sureties, that accepted the Offer. Here, Indemnitors' affirmative defenses are based on different allegations: that the Sureties breached the covenant of good faith and fair dealing and the GIA in failing to reasonably investigate MCC's claims and in settling with ADT&PF for $3.75 million. The merits of those defenses have not yet been decided and are distinct from MCC's breach of the covenant claim that the Court previously addressed. Because the Court finds that a dispute of material fact precludes summary judgment, Indemnitors may still assert their affirmative defenses to the Sureties' claims.

Finally, Indemnitors maintain that summary judgment is not appropriate on the Sureties' claim for $102,925.46 in loss arising from this lawsuit and the

---

[63] Docket 57 at 11-12.

Sureties' enforcement of the GIA.[64] The GIA defines "loss" to include "court costs and expenses, [and] attorneys' fees" and provides that "[a]n itemized statement of Loss, sworn to by any officer of Surety, or the voucher or other evidence or any payment shall be *prima facie* evidence of the fact, amount and extent of the liability of Indemnitors for such Loss."[65] With their motion, the Sureties provided an exhibit containing a table titled Litigation Related Loss Payments.[66] The table sets forth a payee, a payment amount, and a payment date.[67] The table provides no information as to the reason for the payments or what work was conducted in exchange for the payments. The Sureties also filed a declaration by Mr. Domres in which he states that "[a]s a result of defending against claims asserted by MCC in this litigation and enforcing their contractual rights under the GIA, the Sureties have incurred Loss in the form of attorneys' fees and litigation-related expenses. Through the date of this declaration, those litigation-related losses total $102,925.46."[68]

---

[64] Docket 87 at 21-24.

[65] Docket 79-1 at 9, 13.

[66] Docket 79-1 at 65-70.

[67] Docket 79-1 at 65-70.

[68] Docket 79 at ¶ 16 (Domres Decl.) (citing Docket 79-1 at 65-70).

"Merriman Webster defines the term 'itemized' as 'to set down in detail or by particulars; list.'"[69] The Court finds that the exhibit provided by the Sureties lacks the requisite "detail" and "particulars" and therefore the Sureties have not established that they are entitled to summary judgment on their litigation-related losses as a matter of law.

## CONCLUSION

In light of the foregoing, the Sureties' Motion for Summary Judgment at Docket 78 is **DENIED**. A telephonic Trial Scheduling Conference is set for **October 8, 2026, at 3:00 p.m.** All parties may participate telephonically at the conference by dialing 571-353-2301 (Call ID 020262828, Pin 487051) approximately five minutes before the scheduled hearing time.

DATED this 29th day of September, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[69] *Anysa Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, 499 F. Supp. 3d 908, 917 (W.D. Wash. 2020).